UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHER DIVISION

In the matte of:

Scott William Paavo
Robin Lynn Paavo,                          Case No. 09-65854-MBM
                                           Chapter 7
_____ Debtors.  /      Hon. Marci B. McIvor
Cornwell Quality Tools Company,

                Plaintiff,

vs.                                        Adv. Pro. No. 09-7072

Scott Paavo and Robin Paavo,

_____ Defendants.    /


**OPINION DISMISSING PLAINTIFF'S COMPLAINT**

On November 30, 2009, Plaintiff, Cornwell Quality Tools Company, filed a

Complaint against Debtor/Defendants, Scott Paavo and Robin Paavo, seeking to deny

Defendants their general discharge in bankruptcy. On November 29, 2010, the Court

held a trial on Plaintiff's Complaint. For the reasons set forth in the following Opinion,

the Court finds that Defendants are entitled to their general discharge. Plaintiff's claims

under 11 U.S.C. § 727(a)(2), (3) and (5) are DENIED, and Plaintiff's Complaint is

DISMISSED with prejudice.


I.


<u>OVERVIEW</u>


At the outset, the Court notes that it has had to overcome serious challenges to

present an accurate statement of facts. Plaintiff advanced a theory through its

pleadings and testimony at trial that Defendants took significant amounts of Plaintiff's inventory and transferred that inventory to a new business in May, 2009, for the purpose of avoiding payment to Plaintiff.  Unfortunately, as will be discussed in more detail below, the documents and testimony introduced at trial provided no factual support for this theory.

The Court's problem with Defendants' case is of a different nature.  Defendants represented themselves at trial.  At trial Defendants gave very credible testimony regarding the reason they started a new business in May, 2009.  Defendants also gave a credible explanation as to the disposition of Plaintiff's inventory and the steep decline in their income.  Unfortunately, because Defendants were representing themselves, the testimony and evidence presented by Defendants was not as complete as it could or should have been.

The bottom line is that the record in this case is incomplete and imperfect.  That being said, it is clear that Plaintiff has failed to establish that Defendants transferred or concealed assets with the intention of harming Plaintiff.  It is equally clear that Defendants filed bankruptcy for legitimate reasons; by August, 2009, they had suffered a precipitous decline in income, and had too much debt.  Defendants are entitled to discharge under 11 U.S.C. § 727.

II.

FACTUAL BACKGROUND

In 2005, Defendant, Scott W. Paavo, Sr., became an independent dealer for Plaintiff, Cornwell Tools.  Both Defendant, Scott Paavo and his wife, Robin Paavo, were

2

parties to the Cornwell Dealer Agreements.[1]  In June, 2007, Defendant Scott Paavo

became a Cornwell District Manager in Florida.  In January, 2008, Defendants returned

to Michigan.  On January 18, 2008, Defendants entered into a Special Representative

Dealer Franchise Agreement.  That Agreement states in relevant part:

>3.  Upon execution or within thirty (30) days of this agreement, the dealer agrees to place an order for an initial inventory of products from Cornwell with a total regular dealer net price of $35,000.00 (the "Starter Inventory"). Cornwell must approve the Starter Inventory order.  Cornwell will recommend a list of products which will be useful for the dealer in beginning its operation.

>4.  The dealer agrees to pay for the starter inventory in any of the following ways: (1) by paying Cornwell the full amount of the regular dealer net price of the products ordered in cash upon execution of the agreement; or (2) upon prior written approval of Cornwell, with a combination of cash and note; or (3) by meeting the purchase or recruiting requirements set forth in paragraph 4a below.

>4a.  <u>Special Representative Requirements and Benefits</u>.

>To quality for the special representative status and maintain said status the dealer must meet the requirements below. To the extent the requirements of this paragraph (4)(A) conflict with other provisions of this agreement, the requirements of this paragraph shall prevail.

>A.  Dealer must (1) remain a Cornwell Dealer with average purchases of not less than $3,000.00 per week for at least thirty-six (36) months from the date that dealer first makes sale ("Start Date") or (2) introduce at least 3 new dealers to Cornwell within 36 months of the Start Date.

>B.  "Introduction" of new dealers for the purpose of

---

[1]Both Scott and Robin Paavo are named as Defendants.  However, Plaintiff's claims relate primarily to Defendant Scott Paavo's conduct.  Throughout this Opinion, Defendant, singular, refers to Scott Paavo.

Special Representative status means that such new dealer enter into Dealer Franchise Agreements, purchase Starter inventories and remain Cornwell Dealers for a minimum of 6 months each.

C.  Dealer shall execute a note and security agreement for the Starter Inventory, which note and security agreement shall provide that Dealer shall be credited $972.22 against the note and the note shall be considered current as of the end of each month that Special Representative status is maintained.  In the event Dealer ceases to be a Special Representative voluntarily or involuntarily, the remaining balance of the note shall be due and payable according to its terms.  In the event that Dealer introduces 3 new dealers within 36 months, the note shall be cancelled upon the completion of the first six months of the third such new dealer.

On January 18, 2008, Defendants also entered into a Dealer Purchase Order, Note and Security Agreement (Trial Exhibits 1 and 2).  Under the terms of the Dealer Purchase Order, Note and Security Agreement, if the Paavos maintained certain purchase levels and/or recruited up to three new dealers in a thirty-six month period, the indebtedness would be considered paid in full.

In February, 2008, the Defendants began to operate their Special Representative Dealership.  Every week Defendant faxed a Weekly Report to Plaintiff.  The weekly reports stated weekly purchases, sales, accounts receivable and inventory.[2]  Plaintiff also provided Defendants with weekly statements.  The weekly statement shows a more detailed account of inventory purchases and sales.  The weekly statement supplied by Plaintiff to Defendants on December 31, 2008 indicates that in 2008 Defendant had

---

[2]There was no testimony regarding the specific details of any weekly statement.  The weekly statements were not introduced into evidence at trial.  However, post trial, Plaintiff relies on two such statements, the December 31, 2008 statement and the May 2, 2009 statement, to support their case.  These reports are attached as exhibits to Plaintiffs post trial brief.

4

purchased $213,728.43 worth of inventory from Cornwell and that inventory had a "list price" of $398,067.66. As of December 31, 2008, the report also indicates that Defendant had paid for all but $519.11 of the inventory purchased, subject to Plaintiff's right to collect on its original loan if Defendant failed to comply with paragraph 4(a)(A) of the Special Representative Dealer Franchise Agreement. (Plaintiff's Post Trial Brief, Exhibit 3). Because Defendant had satisfied the purchase requirements, Defendant was in full compliance with Paragraph 4(a)(A).

At the end of 2008, Defendants were operating their Cornwell franchise profitably and were current on their obligations. While Defendants were current on payments, they were carrying a substantial amount of credit card debt. (Tr. 181 -184, Defendants' Schedule F). It is unclear exactly how profitable the franchise was in 2008. Defendant Scott Paavo testified that he had sold inventory with an approximate value of $360,000.00. (Tr. 29) However, he stated that he only actually collected $200,000.00 to $250,000.00 in payments (Tr. 172 - 174). This discrepancy is explained in large part by the fact that Cornwell financed approximately $100,000.00 of customer purchases; Defendant received credit for the sale, but when he received payment, the payment went directly to Cornwell. Defendant Robin Paavo testified that the net income from the Cornwell franchise in 2008 was somewhere between $50,000.00 and $80,000.00. (Tr. 176). The income from the Cornwell franchise was the Defendants primary source of income and was used to pay all Defendants bills. (Tr. 180 - 182).

Toward the end of 2008, Kalitta Air, an air freight cargo facility downsized. When Kalitta Air downsized, Defendant lost a significant number of customers. (Tr. 15 - 24, 180, 181). Defendant also lost significant revenue when Kalitta Air downsized because

5

many of Defendant's customers did not pay their outstanding balance to Defendant.  At the end of 2008, Defendant had approximately $30,000.00 in uncollectible accounts receivable.  Approximately $20,000.00 of those accounts have been turned over to a collection agency.  (Tr. 22) The impact of the downsizing of Kalitta Air, both because of the loss of future revenue and the uncollectible accounts, was of great concern to Defendants.  (Tr. 20, 21, 180, 181).

In late December, 2008 or early January, 2009, Defendant proposed that his son, Scott Paavo, Jr. be made a Cornwell dealer in a portion of Defendant's territory with the addition of territory to the south along Lake Huron.  Kalitta Air would not be part of Scott Paavo, Jr.'s territory.

On January 21, 2009, Plaintiff entered into a Franchise Agreement with Scott Paavo, Jr.  On that same day, Scott Paavo, Jr. entered into a Dealer Purchase Order, Note and Security Agreement.  The arrangement was that Scott Paavo, Jr. would take a loan from Plaintiff to fund his purchase of Defendant's outstanding accounts receivable.

About this time, Defendants' computer stopped functioning.  Defendant used the computer to generate weekly reports listing inventory, sales and accounts receivable. The weekly reports were faxed to Plaintiff.  Defendant destroyed the computer in February 2009 because the hard drive contained personal information of Defendant's customers. (Tr. 189).  On February 3, 2009, Defendant Robin Paavo wrote a check in the amount of $100.00 to Dell Business Credit in partial payment for a new Dell computer.  (Trial Exhibit 13).  Defendant manually typed in the account information for each of his customers on the new computer.  (Tr. 109 - 112, 169, 170, 189, 190)

On January 12, 2009, Defendant signed a Dealer Territory Release which stated

6

that Defendant was relocating to a route in the Detroit area.   Plaintiff did not have an established route in the Detroit area.  Plaintiff created a territory in which Defendant would market Cornwell tools.  On January 30, 2009, Defendant signed a document titled "Territory Map for Scott Paavo Sr."  (Trial Exhibit 18).  The Territory Map included a list of names and addresses of businesses in Defendant's new territory.  Of the seventy-two businesses listed on the Map, twenty-seven of those businesses were closed. (Tr. 27, 28).  In addition, at many of the other businesses, the potential purchasers of tools had established relationships with other tool suppliers. (Tr. 40-43).

On the Weekly Statement provided by Plaintiff to Defendants, dated February 12, 2009, Defendants received Special Representative Credit for establishing Scott Paavo, Jr., as a dealer in the amount of a $12,000.00 credit against their original $35,000.00 inventory purchase from Plaintiff. (Special Representative Dealer Franchise Agreement, Section 4(a)(A)).

In January, 2009, Defendants began struggling financially, suffering a loss of income from the downsizing of the Kalitta Air cargo facility and from the reduced income Defendant was receiving after he switched to the Detroit route. (Tr. 180-182.) Defendant's difficulties in the Detroit market are reflected in the amount of inventory purchased from Plaintiff.  From January 1, 2009 through March 19, 2009, Defendant purchased $21,550 of inventory from Plaintiff.  From March 19, 2009 through mid April, 2009, Defendant purchased an additional $4,950 of inventory from Plaintiff.  (Trial Exhibit 8).  In mid April, 2009, Plaintiff stopped permitting Defendant to purchase inventory because he was not meeting his weekly purchase requirements.   (Tr. 76, 80).

In March, 2009, Defendant consulted with a bankruptcy attorney.  On March 16,

7

2009, Defendant Robin Paavo wrote a check to a law firm Gerz and Gross in the amount of $1,750.00. (See Trial Exhibit 14).

On May 11, 2009, Defendant sent a payment of $2,000 to Plaintiff. Defendant sent in the payment to induce Plaintiff to start shipping him inventory again. (Tr. 114). Plaintiff did not send any additional inventory.

On May 20, 2009, Defendant filed Articles of Incorporation for Monster Tools, LLC. (Trial Exhibit 10).

On May 27, 2009, Plaintiff sent Defendants a letter notifying them that Plaintiff was terminating their Cornwell Special Representative Franchised Dealer Agreement for the following reasons:

> Failure to pay as agreed for merchandise delivered by Cornwell in the amount of $3,014.68 and
>
> Failure to maintain the inventory purchase levels required in the agreement. In 2009 you purchased $26,506.51 with an YTD weekly purchase average of $1,325.33 through week #20 of this year, while the required minimum purchase average through week #20 was $2,266.80 ($2,822 x 80%)
>
> We regret to inform you that you have fallen short of the minimum requirements of our Special Rep Program and effective May 31, 2009 we are converting your inventory note with the company to your open account. We (Cornwell Quality Tools Company) have made 73 of the 156 payments on your behalf leaving you a balance of $18,472.26. This termination will be effective on July 2, 2009, unless you have cured your default by bringing your account current and by making the required additional purchases.

Trial Exhibit 8.

Defendant continued to sell his remaining Cornwell inventory through June, 2010. By June, 2010, he was completely out of Cornwell inventory. (Tr. 115, 126, 127).

8

Defendant was unable to cure his default with Plaintiff by the July 2, 2009 cut off date.

Between June, 2009 and September, 2009, Defendant purchased approximately $30,000.00 worth of inventory from another supplier of mobile tools, ISN. The inventory was purchased on credit. (Tr. 44, 115, 132). ISN does not have a security interest in the inventory purchased by Defendant.

On August 20, 2009, Defendants filed a voluntary petition for bankruptcy protection under Chapter 7 of the Bankruptcy Code. Schedule F, the schedule which reflects total unsecured debt, indicates unsecured debt in the amount of $170,127.33. The debts include a large amount of credit card debt, a deficiency balance on a repossessed vehicle and a debt to Plaintiff in the amount of $34,054.93. Defendants' Schedule F does not list ISN as a creditor even though it appears that Defendant owed ISN approximately $18,317.00 on the filing date. (Plaintiff's Post Trial Brief Exhibit 5, statement dated 08/25/09.) Defendants' Schedule A (schedule of real property) indicates that Defendants own both a home located at 7050 Pinetree, Oscoda, Michigan, 48750, valued at $206,800.00 with a mortgage of $192,732.00, and ten acres of undeveloped land valued at $20,000.00 with an outstanding mortgage in the amount of $19,000.00. On Schedule B (personal property), Defendants listed their interests in Cornwell Tools, LLC and Monster Tools, LLC, valuing the interests in both companies as zero. On September 30, 2009, the Chapter 7 Trustee conducted a first meeting of creditors pursuant to 11 U.S.C. § 341 of the Bankruptcy Code. On October 26, 2009, the Chapter 7 Trustee filed a "Report of No Distribution."

On November 30, 2009, Plaintiff filed its Adversary Complaint seeking a denial of Defendants' discharge under 11 U.S.C. § 727 and 11 U.S.C. § 523(a)(2)(A). On

9

December 29, 2009, Defendants filed an answer to Plaintiff's Complaint.  On

May 13, 2010, Plaintiff filed a Motion for Summary Judgment requesting that

Defendant's debt to Plaintiff be found to be nondischargeable  under § 523(a)(2)(A) and

seeking a denial of Defendants' general discharge under 11 U.S.C. §§ 727(a)(2), (3),

and (5).  On June 29, 2010, this Court entered an Order Dismissing Plaintiff's Complaint

with regard to claims alleged under 11 U.S.C. § 523(a)(2)(A).  This Court found that

there were questions of fact with regard to Plaintiff's allegations pursuant to 11 U.S.C. §

727(a)(2), (a)(3) and (a)(5).[3]  On November 29, 2010, this Court held a trial on the

counts of Plaintiff's complaint relating to 11 U.S.C. § 727.


III.

<u>JURISDICTION</u>

Bankruptcy courts have jurisdiction over all cases under Title 11 and all core

proceedings arising under Title 11, or arising in a case under Title 11.  28 U.S.C.

§§ 1334 and 157.  Core proceedings include proceedings to deny a debtor his

discharge.  *Id*. § 157(b)(2)(j).  As this is a proceeding to deny Debtors their discharge,

this is a core proceeding under 28 U.S.C. § 157(b).  Thus, this Court has jurisdiction

over this matter.


IV.

---

[3]In Plaintiff's post-trial brief, Plaintiff seeks to have Defendants' discharge denied
pursuant to 11 U.S.C. § 727(a)(4).  Because this issue was not pled in the Complaint
and was never raised at trial, the Court finds it unnecessary to address this new claim.

10

A fundamental objective of the bankruptcy law is to afford a deserving debtor an economic rehabilitation or "fresh start" in life. *First American Bank of New York v. Bodenstein (In re Bodenstein)*, 168 B.R. 23, 27 (Bankr. E.D.N.Y. 1994). This fresh start policy, however, is balanced against an equally important objective, that being to prevent the "dishonest debtor's attempt to use the law's protection to shield his or her wrongdoing." *Id. citing National Bank of Am. v. Newmark (In re Newmark)*, 20 B.R. 842, 852 (Bankr.E.D.N.Y.1982). Thus, the Bankruptcy Code provides that certain debts are excepted from discharge and that a debtor may be denied a discharge from all of his debts under specific and well defined circumstances. *See* 11 U.S.C. § 523(a)(2), (4) and (6) and 11 U.S.C. § 727(a)(2)-(a)(7).

Courts adhere to certain guiding principles in assessing dischargeability and discharge objections under 11 U.S.C. §§ 523(a) and 727(a). *Bodenstein*, 168 B.R. at 27. One of these widely recognized tenets is that exceptions under both 11 U.S.C. § 523(a) and § 727(a) should be literally and strictly construed against the creditor and liberally in favor of the debtor. *Boyle v. Abilene Lumber, Inc. (In re Boyle)*, 819 F.2d 583, 588 (5th Cir.1987)(with respect to § 523(a)); *Commerce Bank & Trust Co. v. Burgess (In re Burgess)*, 955 F.2d 134, 137 (1st Cir.1992)(with respect to 727(a)).

The burden of proving non-dischargeability under either § 523(a) or § 727(a) is upon the party opposing discharge of the debt. *Benich v. Benich (In re Benich)*, 811 F.2d 943, 945 (5th Cir.1987); Fed. R. Bankr. P. 4005. The quantum of evidence necessary to sustain a statutory exception to dischargeability is a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 287 (1991)(with respect to § 523(a));

11

*Beaubouef v. Beaubouef (In re Beaubouef)*, 966 F.2d 174, 178 (5th Cir.1992)(with respect to § 727(a)).

A.  <u>Plaintiff has Failed to Prove that Defendants' Debts are Excepted from Discharge Under § 727(a)(2) (for Understating Income and Concealing Assets)</u>.

11 U.S.C. § 727(a)(2) allows for the denial of a debtor's general discharge if a debtor transfers property for the purposes of defrauding a creditor, within one-year before the date of the filing of the petition.  Specifically, § 727(a)(2) states:

(a) The court shall grant the debtor a discharge, unless –

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed –

(A) property of the debtor, within one year before the date of the filing of the petition; or

(B) property of the estate, after the date of the filing of the petition.

The burden of proof under this section is on the party objecting to discharge. "This burden will shift to the debtor if the party objecting to the discharge puts forth sufficient evidence to establish a *prima facie* case.  Thereafter, the debtor must present evidence to rebut the objecting party's claim.  Nevertheless, it is always the party objecting to the discharge who bears the ultimate burden of persuasion, to prove by a preponderance of the evidence that all the statutorily required elements have been met." *In re Sowers*, 229 B.R. 151, 156 (Bankr. N.D. Ohio, 1998) *citing Barclays/American Business Credit, Inc. v. Adams*, 31 F.3d 389, 393-94 (6th Cir. 1994).

In order to deny a debtor his discharge under § 727(a)(2), the objecting party must prove: (1) there was a transfer, removal, destruction, mutilation, or concealment of

12

property; (2) belonging to the debtor; (3) within one year of filing the bankruptcy petition; and (4) with actual intent to hinder, delay, or defraud creditors or an officer of the estate. *See, e.g., In re Halperin*, 215 B.R. 321 (Bankr. E.D.N.Y. 1997).

      1.   <u>Concealment of Assets</u>

In this case, Plaintiff alleges that Defendants' general discharge should be denied because Defendants concealed or transferred significant assets within one year prior to the filing of the bankruptcy petition. Specifically, Plaintiff claims that: (1) Defendants understated their earnings in 2008 and 2009; and (2) Defendants concealed or transferred inventory with significant value.[4]

In support of Plaintiff's argument that Defendants understated their income in 2008, Plaintiff alleges that Defendant understated his income on his 2008 tax return, and understated his income generally. Plaintiff relies on the "list price" of the inventory purchased by Defendants in 2008 ($396,000.00) and Defendant's testimony at trial that his gross sales in 2008 were approximately $360,000. (Tr. 29). However, Defendant also testified that, of that amount, he only collected between $200,000 and $250,000. This testimony is consistent with the testimony Defendant gave at a prior deposition. (Tr. 158, 160). Defendant Robin Paavo testified credibly that their profit in 2008 was between $50,000.00 and $80,000.00. (Tr. 176). None of the figures given by Defendants match up exactly with the figures on the tax return, although Defendants'

---

[4]Plaintiff states for the first time in its post trial brief that on August 5, 2009, Defendant received $13,000.00 from an unknown source and paid that same amount to Ford Credit. Because Plaintiff raises this fact for the first time post-trial and there is no testimony from either Plaintiff or Defendants regarding this transaction, the Court is disregarding this statement.

figures are close. The Court concludes that Plaintiff's estimates as to Defendants

income in 2008 are pure speculation and that Defendants' estimates as to their gross

and net income in 2008 are fairly accurate. With regard to any misstatements on the

2008 tax return, the return was prepared by an accountant. In the absence of testimony

from the accountant, the Court draws no conclusions about the accuracy of Defendants'

2008 return.

More importantly, even if Plaintiff's allegation that Defendants have understated

their income for 2008 is true, it is not relevant to proving nondischargeability under 11

U.S.C. § 727(a)(2), unless Plaintiff can show that Defendants concealed or transferred

income or assets to avoid the payment of creditors. Plaintiff does not allege that

Defendants concealed or transferred income in 2008 to avoid the payment of their

creditors. In fact, at the end of 2008, Plaintiff's own weekly statement shows that

Defendants were current on their obligations to Cornwell and their other creditors.

While Defendants had credit card debt, they were paying their bills as they became due.

(Tr. 180 - 184). Thus, Plaintiff has provided no evidence that Defendants were

concealing or transferring income or assets in 2008 to avoid paying creditors.

Plaintiff also argues that Defendants grossly understated their 2009 income.

Plaintiff's argument is based on assumptions about the amount of inventory sold by

Defendant and the price at which that inventory was sold. Both Defendants testified

credibly that their income had declined precipitously in 2009 as a result of the

downsizing of the Kalitta Air cargo facility and Defendant's switch to the Detroit route.

Defendants' Schedule B and bank records reflect less than $400.00 in Defendants'

bank accounts at the time they filed for bankruptcy. Defendants Schedule A (real

14

property) lists no unencumbered assets.  Plaintiff presents no evidence that Defendants have any assets other than those listed in their Schedules.  Therefore, this Court finds that Plaintiff's have failed to meet their burden of proof with regard to their allegations that Defendants have concealed assets or income to the detriment of creditors.

Plaintiff next argues that Defendants concealed inventory with significant value. Plaintiff divides Defendant's inventory purchases into three categories: (1) Cornwell inventory on hand at the end of 2008; (2) Cornwell inventory purchased in 2009; and (3) inventory purchased from ISN after Cornwell terminated Defendant as a Cornwell dealer.  (See Plaintiff's Post Trial Brief, pg. 4-6).  Plaintiff alleges that, at the end of 2008, Defendant retained Cornwell inventory with a net value of approximately $35,000.00.  Plaintiff then alleges that as of May 2, 2009, Defendant retained Cornwell inventory with a net value of approximately $42,113.80.  Lastly, Plaintiff alleges that Defendant purchased approximately $34,000.00 of inventory from ISN from June through August, 2009.  These figures are based on weekly reports supplied by Defendants to Plaintiff and attached as exhibits to Plaintiff's Post Trial Brief.  (Post Trial Brief Exhibits 4 and 8).[5]  Based on these alleged amounts of inventory, Plaintiff draws two conclusions: (1) that in May, 2009, Defendant transferred inventory with significant value to its new business Monster Tools, Inc.; and (2) on August 20, 2009, when Defendants filed for bankruptcy, Defendants owned inventory with significant value that they failed to disclose on their Schedules.

Plaintiff's allegations regarding the existence of undisclosed inventory, conflict

---

[5]None of these statements were admitted into evidence at trial.

directly with Defendants testimony at trial.  Defendants testified as follows:

> The Court:     Well, let's go back to the inventory that you
>                had.  What happened to the Cornwell inventory
>                that you had at the beginning of January,
>                2009?
>
> Mr. Paavo:     It was sold out from January to June, July.
>
> The Court:     And the money that you made on that
>                inventory, most of it you used to purchase
>                more inventory from Cornwell?
>
> Mr. Paavo:     I used it to pay my bills.
>
> Ms. Paavo:     But we did send them a payment of $2,000
>                May 11th of 2009.  We did send them another
>                $2,000 payment towards our balance at that
>                time.
>
> The Court:     And when you purchased new inventory as
>                that inventory was sold - - when you purchased
>                new inventory, it was - - the amount of
>                inventory you were purchasing on a weekly
>                basis was significantly less than the inventory
>                you'd purchased in 2008; is that correct?
>
> Mr. Paavo:     Oh, yes.
>
> Ms Paavo:      Plus I think we were on hold at that point
>                because if you're not current on your tool
>                statement, they won't ship anything new, so I
>                believe we were on hold at that time because
>                we were having trouble making ends meet to
>                even get them any money.
>
> The Court:     So when was the last time you obtained
>                inventory from Cornwell?
>
> . . .
>
> Ms. Paavo:     It would have been probably March or April.
>                I'm guess - - I honestly don't have it in front of
>                me.  That's just an estimate.

(Tr. 45 - 46)

BY THE COURT:

Q    Mr. Paavo, just answer my questions. When you sent that $2,000 payment, why did you send that $2,000 payment?

A    Because I was still a dealer.

Q    And you wanted that payment to reduce your balance owed?

A    To start shipping tools, but it just never - - you know, never happened.

Q    Were you hoping that when you sent that $2,000 payment that that would put you back in good credit standing so you could start to obtain inventory?

A    It should, yeah.

(Tr. 113 - 114)

Defendants went on to testify regarding their purchase of inventory for their new

business Monster Tools, LLC.

Q    And why did you - - well, first, when did you do that [buy inventory from ISN ]?

A    That was in, I believe, June. I'm thinking it was June because I got rid of - - or Cornwell terminated me. I got the inventory, and I started up Monster Tools. And I just - - I needed inventory to go out there, and that's what I did. And I did that till - - I don't know - - August somewhere, September, I think, and then I'm done. I gave it up.

. . .

Q    And at the time you were terminated by Cornwell, did you have any inventory left to ship back to Cornwell, or were you completely out of inventory?

A    I was completely out. That's why I had to go with ISN to - - because I had an account with them set up. I've

17

always had one, you know, for special order stuff, and I was out of tools. I couldn't get anything, so I started Monster Tools, and that's where I got my inventory to start Monster Tools.

Q    And then what happened to that inventory, the inventory you purchased from ISN?

A    Well, that's pretty much sold out, and I'm still making payments on that.

Q    And you sold that inventory. Why weren't - - when you sold the inventory, why weren't you able to pay off ISN?

A    Oh, because I was paying attorney fees. I have these guys barking at me all - - I mean for a year and a half now I've had more attorneys and court dates and everything else. I mean they just - - I'm out of money. They run me out of money.

(Tr. 114 - 116).

This Court finds Defendant's testimony regarding the disposition of the Cornwell and ISN inventory to be credible. The Court concludes that Defendant sold all of its Cornwell inventory prior to purchasing inventory from ISN.

Plaintiff has provided no evidence in support of its allegation that Defendants had significant amounts of Cornwell inventory at the time they started Monster Tools, LLC or that Defendants had significant amounts of inventory at the time they filed for bankruptcy. Defendant testified that he purchased $30,000.00 to $35,000.00 of inventory from ISN after Plaintiff terminated Defendants as Cornwell dealers (which Plaintiff does not dispute). Yet, Plaintiff also alleges that Defendant had $42,113.80 of Cornwell net inventory as of May 2, 2009. (Plaintiff's Post Trial Brief, p. 5). This Court cannot reconcile why Defendants purchased inventory from ISN and went further into

18

debt if, in fact, they had Plaintiff's inventory on hand.  The fact that Defendant purchased additional inventory in June, 2009, supports the Court's finding that Defendants had no Cornwell inventory at the end of May, 2009, and had to purchase inventory from an independent supplier if they were going to continue to try and make a living as mobile tool suppliers.

The Court also finds that Plaintiff has failed to introduce any evidence or testimony to support their allegation that Defendants had a significant amount of ISN inventory on the date Defendants filed for bankruptcy.  It is an undisputed fact that Defendants purchased approximately $30,000.00 of inventory from ISN.  However, Defendant was selling his inventory as he purchased it, in an attempt to maintain a living as a mobile tool salesman.  Defendant was unable to operate his new business profitably, and by September, 2009, he was out of the mobile tool business.  Plaintiff's argument that Defendant had inventory of substantial value on the date he filed for bankruptcy is pure speculation.  The Court notes that the Chapter 7 Trustee examined Defendant regarding his assets at the first meeting of creditors on September 30, 2009. In his report of no distribution filed on October 26, 2009, the Trustee concluded:

> I have made a diligent inquiry into the financial affairs of the debtor(s) and the location of the property belonging to the estate; and that there is no property available for distribution from the estate over an above that exempted by law.

Based on the evidence, and testimony at trial, the Court finds that Defendants did not understate their income or conceal or transfer assets with the intention to hinder, delay or defraud a creditor.

19

2.    <u>Destruction of records</u>

Plaintiff also alleges that within one year of the filing of the bankruptcy petition, Defendant destroyed records relating to his inventory, accounts receivable and payments and that, under § 727(a)(2), doing so must result in the denial of the Defendants' general discharge.

In this case, Defendant testified that his old computer stopped functioning and he destroyed the hard drive because it contained the personal information of his customers, including names, addresses and credit card information.  Defendant further testified that he purchased a new computer and downloaded the software necessary to receive Cornwell pricing information and track accounts receivable and payments.  In addition, Defendant testified that, after Plaintiff terminated his franchise on May 27, 2009, he destroyed receipts and invoices containing personal information of Cornwell customers.

The Court notes that in order for Plaintiff to meet its burden of proof under § 727(a)(2), Plaintiff must show not only that Defendant concealed or transferred assets, but that Defendant did so with the specific intent to hinder or delay creditors. This Court finds that, while Defendant did destroy his old computer and destroyed certain records, Defendant provided a credible explanation for his conduct, and that the destruction of any records relating to sales to customers was not done with an intent to hinder, delay or defraud creditors.   Because there is nothing in the record to demonstrate that Defendants took any action with the specific intent of harming creditors, there are no grounds for denial of Defendants' general discharge under § 727(a)(2).

20

B.       Plaintiff Fails to Prove that Defendants' Debts are Excepted from Discharge
        under § 727(a)(3) (for Failure to Maintain Adequate Records).

        11 U.S.C. § 727(a)(3) allows for the denial of a debtor's general discharge if the

debtor has destroyed books and records, unless the act of destruction was justified.

Specifically, § 727(a)(3) bars a debtor's discharge if:

> the debtor has concealed, destroyed, mutilated, falsified, or failed to keep
> or preserve any recorded information, including books, documents,
> records, and papers, from which the debtor's financial condition or
> business transactions might be ascertained, unless such act or failure to
> act was justified under all of the circumstances of the case[.]

11 U.S.C. § 727(a)(3).

        The standard for denial of discharge under § 727(a)(3) was explained by the

Court in *CM Temporary Services, Inc. v. Bailey (In re Bailey)*, 375 B.R. 410 (Bankr. S.D.

Ohio 2007):

> Section 727(a)(3) has been interpreted to apply a shifting burden of proof.
> The Plaintiff must establish a prima facie case showing the Debtor failed
> to keep adequate records. *Grange Mut. Ins. Co. v. Benningfield (In re
> Benningfield)*, 109 B.R. 291, 293 (Bankr.S.D.Ohio 1989). For purposes of
> § 727(a)(3), the Plaintiff is not entitled to perfect, or even necessarily
> complete, records. Instead, the Debtor must provide the Plaintiff 'with
> enough information to ascertain the debtor's financial condition and track
> his financial dealings with substantial completeness and accuracy for a
> reasonable period past to present.' *Turoczy Bonding Co. v. Strbac (In re
> Strbac)*, 235 B.R. 880, 882 (6th Cir. BAP 1999), *quoting Bay State Milling
> Co. v. Martin (In re Martin)*, 141 B.R. 986, 995 (Bankr.N.D.Ill.1992).

*In re Bailey*, 375 B.R. at 415.  In other words, 11 U.S.C. § 727(a)(3) bars a discharge

where the information a debtor fails to provide prevents the trustee and creditors from

obtaining a complete picture of a debtor's finances.

        In this case, Plaintiff alleges that, if it had the hard drive from Defendants' new

computer, Plaintiff would be able to demonstrate that Defendant owned inventory on the date Defendants filed their petition that Defendants failed to disclose.  Plaintiff has not specified exactly what records it believes that the Debtor has failed to keep, other than the hard drive from the old computer and the hard drive from the new computer.

This Court finds that Plaintiff has failed to establish a *prima facie* case showing that the Defendants failed to keep adequate records.  This Court finds credible Defendant's testimony regarding the disposition of Cornwell's inventory in May, 2009 and the disposition of the inventory he purchased from ISN.  Post trial, Defendants provided Plaintiff with documents detailing all Defendant's purchases from, and account balances with, ISN.  Accordingly, the argument that Defendants deliberately destroyed records to prevent Plaintiff from ascertaining their true financial condition is not supported by the evidence.  In addition, the Court notes that the Chapter 7 Trustee raised no issues with regard to the adequacy of Defendants records.  For these reasons, this Court finds that Plaintiff has failed to meet its burden of proof to establish non-dischargeability under 11 U.S.C. § 727(a)(3).


C.    Plaintiff Failed to Prove that Defendants' Debts are Excepted from Discharge under § 727(a)(5) (for Failure to Explain Pre-prepetition Diminution of Assets).

11 U.S.C. § 727(a)(5) provides that the court shall grant the debtor a discharge unless "the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities."   The purpose of this section was explained by the court in *In re McVay*, 363 B.R. 824 (N.D. Ohio 2006):

This section is derived from competing concerns: (1) the trustee and creditors' right to question the debtor about their financial affairs; and (2) the knowledge that debtors will not always be completely forthcoming with information about their financial activities. Section 727(a)(5) seeks to address these competing concerns by conditioning discharge on a debtor satisfactorily explaining any prepetition diminution or loss of asset. In order to achieve this, paragraph (a)(5) requires debtors to disclose all vital information; there is no requirement of mal-intent or scienter. In addition, it does not matter under § 727(a)(5) how the loss or deficiency occurred. For example, money spent on illegal activities does not run afoul of § 727(a)(5). Section 727(a)(5) is simply concerned with the adequacy of the debtor's explanation.

*Id.*, 363 B.R. at 830-831 (citations omitted).

To satisfy its initial burden of proof, Plaintiff must show two things: first, that the Defendants had a cognizable ownership interest in a specific asset, and second, that the Defendants' interest existed at a time not too far removed from when the petition was filed. *Id.* Once Plaintiff has met its burden, Defendants must satisfactorily explain the loss. The standard for a satisfactory explanation under § 727(a)(5) "is one that is reasonable under the circumstances." *Id.* at 831 (quoting *Lacy Wholesale & Main Factors v. Bell (In re Bell)*, 156 B.R. 604, 605 (Bankr. E.D. Ark. 1993). A reasonable explanation involves capacity for verification. The explanation should enable a creditor to investigate the circumstances of the loss. *Id.*

Plaintiff argues that Defendants have not accounted for the inadequacy of their assets to meet their liabilities. Specifically, the Plaintiff alleges that the Defendants have failed to account for the inventory Defendant had on hand at the end of 2008, and the inventory purchased in 2009. In the alternative, Plaintiff alleges that Defendants have failed to account for the income that should have been generated from the sale of that inventory.

23

This Court finds that, based on the record, Defendants have fully explained the loss of assets and the inadequacy of their assets in light of their liabilities. The Court has addressed the issue of Defendants' disposition of the inventory in the discussion of 11 U.S.C. § 727(a)(2); Defendants' testimony that they sold all of the inventory is completely credible.

With regard to Plaintiff's argument that Defendants have not accounted for their income in 2008 and 2009, the Court disagrees. Plaintiff alleges that Defendants had to have made a large profit on the sale of inventory, a profit Plaintiff claims that Defendants have not accounted for. With regard to Defendants income in 2008, it is undisputed that Defendants operated their Cornwell franchise profitably in 2008. However, the amount earned by Defendants was in the range of $50,000.00 to $80,000.00, and that amount was Defendants sole source of income. That income was not concealed or transferred, it went to pay Defendants' mortgage payment and other bills.

Plaintiff also argues that Defendants have failed to account for their income in 2009. Again, Plaintiff's argument is based on assumptions, rather than facts in the record. Plaintiff assumes that Defendant had "x" amount of inventory which they sold at "y" price. Unfortunately Plaintiff presented no credible evidence to support either "x" or "y". Rather, the evidence shows that Defendants had some inventory on hand at the beginning of 2008, (Tr. 26), but whatever price that inventory sold for was most likely offset by the large amount of money Defendants have been unable to collect. Defendant testified that he could not collect almost $30,000.00 after Kalitta Air closed (Tr. 22); he also testified that he had trouble collecting from many of his customers in

24

Detroit. (Tr. 97, 98). The Court is concluding that any revenue Defendants generated from the sale of inventory Defendants retained at the end of 2008 is more than set off by Defendants uncollectible accounts receivable.

With regard to income generated from inventory purchased in 2009, it is undisputed that in 2009, Defendants purchased $26,506.00 worth of inventory from Cornwell and approximately $30,000.00 worth of inventory from ISN. There is no consistent testimony as to the amount Defendant marked tools up over the list price when he sold tools to customers. Both Defendants testified that Defendant Scott Paavo frequently sold inventory at a discount. (Tr. 92, 184). Defendant, Scott Paavo also testified that generally he was expecting a thirty-five (35%) percent profit margin with Cornwell. (Tr. 132). Assuming a thirty-five (35%) percent profit margin (only because there is no better figure available) the retail value of $56,600.00 worth of inventory equals $76,410.00. ($56,600.00 plus [.35% times $56,600.00]). Assuming Defendants actually had $76,410.00 in income, from inventory purchased in 2009, a portion of that income was paid to Plaintiff for the inventory purchased in 2009. Plaintiff's own records indicate that as of the date Plaintiff terminated Defendant, Defendants had purchased $26,506.51 worth of inventory and only owed $3,014.68 for that inventory. (Trial Exhibit 8). Therefore, Defendants had paid $23,491.83 in 2009 to Plaintiff. In addition, Defendants made ongoing payments in unknown amounts to ISN for the inventory purchased from ISN. Given the original amount owed to ISN and the account balance on the date Defendants filed for bankruptcy, the figure appears to be approximately $10,000.00. Defendants Schedule J states that Defendants had monthly expenses of $4,911.62, not including any expenses for credit card payments, attorney bills, or

25

expense related to operation of the business.  The Defendants income from the sale of

inventory in 2009 and Defendant, Mrs. Paavo's income can be summarized as follows:

| Income | Amount |
|---|---|
| Sale Income from sale of inventory estimating a 35% mark-up on list price (income from the sale of inventory January through September, 2009) | $76,410.00 |
| Income Attributable to Mrs. Paavo January through September, 2009 (Schedule I) | $ 8,820.00 |
| **TOTAL INCOME** | **$85,230.00** |

| Expenses | Amount |
|---|---|
| Payments to Cornwell | $23,491.83 |
| Payments to ISN | $10,000.00 |
| Living Expenses reflected on Schedule J (January through September, 2009 | $44,204.58 |
| Miscellaneous Expenses not reflected on Schedule J, but listed on Defendants 2009 tax return, including repairs and maintenance, computer support, postage and delivery, uniforms, telephone, court fees and internet use (Plaintiff's Post Trial Brief Exhibit 16 ) | $16,324.00 |
| **TOTAL EXPENSES** | **$94,020.41** |

Income       $ 85,230.00
**less** Expenses    <u>94,020.41</u>
(-$ 8,790.41)

The Court concedes that the above numbers are approximations based on a

spotty record. Even so, Plaintiff is receiving the benefit of the doubt on the income side, as there is no actual evidence to indicate that Defendant made a 35% profit on the inventory he had in his possession in 2009. Furthermore, the Court believes that the estimates as to Defendants expenses are on the low side. Defendant testified that he had expended considerable amounts of money in defending a state court lawsuit brought by Plaintiff. The figure above also may not fully account for other expenses incurred by Defendant in the operation of his business. In any case, the Court concludes that even on this spotty record, Defendants have fully accounted for their income in 2009.

The Court is satisfied that Defendants have accounted for the inadequacy of their assets to meet their liabilities. Plaintiff has failed to met their burden of proof to establish a claim under 11 U.S.C. § 727(a)(5).


V.

CONCLUSION

Based on the exhibits submitted into evidence and the testimony of the witnesses at trial, this Court concludes that there is no evidence in the record to support a finding that Defendants filed bankruptcy with any intent to defraud their creditors. Defendants are entitled to a discharge under 11 U.S.C. § 727. For the reasons set forth above, Plaintiff's Complaint is DISMISSED with prejudice.


Signed on February 14, 2011

/s/ Marci B. McIvor
Marci B. McIvor
United States Bankruptcy Judge

28